**PAPER CONVERTING MACHINE COMPANY, Plaintiff,**

v.

**MAGNA–GRAPHICS CORPORATION, Defendant.**

Civ. A. No. 79–C–499.

United States District Court,
E.D. Wisconsin.

Dec. 1, 1983.

Jerome F. Fallon, Tilton, Fallon, Lungmus & Chestnut, Chicago, Ill., and Franklyn M. Gimbel, Gimbel, Gimbel & Reilly, Milwaukee, Wis., for plaintiff.

Glenn O. Starke and Eugene R. Sawall, Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This action is an accounting for damages for patent infringement arising under the patent laws of the United States, Title 35 U.S.C. The plaintiff additionally requests attorneys' fees pursuant to 35 U.S.C. § 285. The court has jurisdiction under 28 U.S.C. § 1338, and venue lies in this district under 28 U.S.C. § 1400(b).

The plaintiff Paper Converting Machine Company ("Paper Converting") is a Wisconsin corporation having its principal place of business in Green Bay, Wisconsin. The defendant Magna-Graphics Corporation ("Magna-Graphics") also is incorporated in Wisconsin and has its principal place of business in Oconto Falls, Wisconsin.

In an order dated February 26, 1981, this Court held plaintiff Paper Converting's United States Patent Reissue No. 28,353 to be valid and infringed by defendant Magna-Graphics' manufacture and sale of a rewinder to Scott Paper Company ("Scott") at Oconto Falls, Wisconsin.[1] The Court

1. The invention of the patent-in-suit relates to apparatus for high speed winding a web into rolls, as exemplified by toilet paper and roll towels. When the paper has been sufficiently wound on one core, it is necessary to cut the web and transfer the leading edge of the cut web to a new core. This was done, according to the invention, by a novel cutoff and transfer mechanism referred to as a "high speed bedroll." This bedroll is provided as part of winding apparatus, generally called a "rewinder." Paper Converting has sold 572 rewinders since 1962, which included the patented high speed bedroll.

Two kinds of rolls were produced: those for the consumer market which were characterized as "soft" wound and those for the institutional market known as "hard" wound. The purchas-

awarded treble damages for willful and deliberate infringement pursuant to 35 U.S.C. § 284. *See* 211 U.S.P.Q. 789. On April 26, 1982, the Court of Appeals for the Seventh Circuit affirmed this Court's judgment. Finally, on June 10, 1982, the Court ordered the accounting which now lies before it. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the foregoing discussion in addition to what follows shall constitute the Court's findings of fact and conclusions of law with respect to both the accounting for damages instituted under 35 U.S.C. § 284 and the plaintiff's motion for an award of attorneys' fees under 35 U.S.C. § 285.

## I. DAMAGES

■■■ The patent statute defining damages for patent infringement states:

Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284. Under this statutory rule the patent owner may recover only what he would have made had the infringer not infringed; that is, his "damages." This assessment is made without regard to the profits, if any, of the infringer. *See Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 505, 84 S.Ct. 1526, 1542, 12 L.Ed.2d 457 (1964).

The instant accounting raises five issues bearing on the calculation of the plaintiff's damages:

1. Should the damages be computed on the basis of Paper Converting's lost profits on the infringing sale or on a reasonable royalty?

2. Should a lost profits computation employ the incremental income theory of costing?

3. Should the sale of the Fort Howard rewinder be included in the computation of damages?

4. Should the damages be computed on the basis of the entire rewinder line or simply the patented device itself?

5. Should prejudgment interest be awarded?

### A. *Lost Profits*

■■■ In determining what damages are adequate to compensate the patent holder for the infringement, the Court, in certain circumstances, may look to the profits the patent holder lost as a result of the infringement. Lost profits is a proper measure of damages when the patent holder is able to demonstrate that " 'but for' the infringement, he would have made the sales that the infringer made." *Milgo Electronic Corporation v. United Business Communications, Inc.*, 623 F.2d 645, 663 (10th Cir.1980). To make this demonstration and thus to show that the lost

---

ers of hardwound rolls were interested in getting large amounts of footage in the rolls so that they had to be replaced less frequently in hotels, restaurants, and the like. Irrespective of the final usage, the same high speed bedroll was used in the rewinder. Until the infringement, no machines except those incorporating the patented high speed bedroll were able to wind hard rolls continuously at high speeds above 1,200 feet per minute.

One of the issues in the instant accounting relates to the auxiliary equipment used with the rewinder. The rewinder, standing alone, could not produce wound rolls. At the very least, it required an "unwind" and a "core loader." The unwind consisted of a heavy stand for supporting the parent roll which provided the continuous web. The parent rolls as they came from the paper-making machine are upwards of five

feet in diameter and more than five feet long. Also, because of the high speed, continuous operation, the rewinders required "core loaders"—auxiliary machines for storing bare cardboard cores and for supplying them to the rewinder at the proper time in the continuous operation. Other auxiliary equipment normally purchased along with the rewinder were embossers for developing patterns in the web, tail sealers for adhering the last portion of the web to the rewound roll, and the drive for coordinating the operation of the various components of the line.

The instant accounting is for damages arising from two infringing sales. Magna-Graphics obtained orders for a rewinder line from Scott Paper Company for its Oconto Falls, Wisconsin, mill and from the Fort Howard Paper Company. Paper Converting was the only other bidder on these rewinder lines.

profits are provable, the patent holder must come forward with affirmative evidence of "the demand for his patented product in the marketplace, the absence of acceptable non-infringing substitutes, and his production and marketing capacity to meet the demand." *Id.* The "but for" rule requires proof to a reasonable probability and commonly is satisfied when the parties involved in the action are the only suppliers.

■■■ When lost profits are incapable of proof to a reasonable probability, the Court will assess a "reasonable royalty" as damages. A reasonable royalty should be set in all cases, however, inasmuch as the patent statute requires that damages be no less than a reasonable royalty. *Wahl v. Carrier Manufacturing Co.*, 511 F.2d 209, 211 (7th Cir.1975). *See infra* pp. 25–26.

In arguing that the "lost profits" method is inappropriate in this case, Magna-Graphics relies on two types of evidence. First, the defendant has introduced evidence of the difference in price Paper Converting and Magna-Graphics would charge its customers for rewinders alone and in combination with other auxiliary equipment used with the patented rewinder. Magna-Graphics correctly cites *Broadview Chemical Corporation v. Loctite Corporation*, 311 F.Supp. 447 (D.Conn.1970), for the proposition that one factor weighing in favor of the "lost profits" formula is a finding that the infringer sold the patented item at prices almost identical to those of the patent holder. The district court stated that "[i]f [the infringer] had sold [the patented item] at prices substantially lower than [the patent holder's], that might militate against a finding that [the patent holder] would have made the same sales." *Broadview*, 311 F.Supp. at 451 (*dictum*).

Magna-Graphics adduced as evidence a price comparison sheet revealing that it offered to charge Scott $140,000 for the hardwound rewinder itself, whereas Paper Converting bid $306,788. For the rewinder plus the other auxiliary equipment needed by Scott the defendant bid $231,835 to the plaintiff's $407,353. Scott accepted Magna-Graphics' bid. This price differential, the defendant contends, makes it improbable that but for the infringement Scott would have purchased a rewinder from Paper Converting.

In addition to this price data, the defendant has offered the testimony of Thomas Cook, a former employee of Scott, and Bernard Dahlin, an employee of the Fort Howard Paper Company ("Fort Howard"). It was Cook's opinion as maintenance and utilities manager at Scott's Oconto Falls plant, which bought the infringing rewinder, that the cost of Paper Converting's machine was too high to satisfy Scott's economic requirements for capital expenditures of this kind. In view of these economic hurdles, Scott would not have bought the machine from Paper Converting if Magna-Graphics had not submitted a bid. Bernard Dahlin was an assistant superintendent of maintenance for Fort Howard; he stated in deposition that Fort Howard had not committed itself to purchase a rewinder for its Muskogee plant, and that the company may have chosen to buy used equipment for its future use; however, he was uncertain.

■■■ The burden here is on the plaintiff to show affirmatively that, in all reasonable probability, it would have sold rewinders to Scott and Fort Howard if the defendant had not sold its infringing machines. The Court finds that the plaintiff has met its burden.

The first two elements of the plaintiff's proof—whether acceptable noninfringing substitutes exist and whether the plaintiff has the requisite production and marketing capacity—are amply supported by the evidence and are not sharply contested by the defendant. Paper Converting had all of the patterns, jigs and fixtures, all of the mechanical equipment, and all of the engineering and shop skills necessary to produce the two additional machines sold by Magna-Graphics. The machines vary according to the width of their rolls, and Paper Converting carried all of the common widths designed. Indeed, the additional machines would have constituted only a

small portion of Paper Converting's total capacity. In addition, Paper Converting had an ample sales force to make these sales and, in fact, had quoted on both machines.

Most importantly, there are only two suppliers of the hardwound rewinder machines who could satisfy the 1,600 feet per second speed requirement set by Scott and Fort Howard: Paper Converting and Magna-Graphics. Of the total market for rewinders, including both hardwound and softwound machines, Paper Converting held a 90% share. Paper Converting occupied 96% of the total market for hardwound rewinders. The evidence reveals a clear absence of noninfringing substitutes.

The issue, therefore, is not whether some third party, instead of the plaintiff, would have made the sales to Scott and Fort Howard, but rather whether Scott and Fort Howard would have foregone their purchase of new rewinders altogether if Magna-Graphics had not submitted its bid. Magna-Graphics has attempted to demonstrate the absence of a demand in the marketplace for Paper Converting's patented rewinder, owing to its excessive price. The Court is persuaded more by the long history and continuous volume of the plaintiff's sales of rewinder lines to Fort Howard and Scott than it is by the defendant's price-related data and testimony. The patent holder need not negate all possibilities that the purchasers might have bought a different product or might have foregone their purchases altogether. Price is but one factor. *See Broadview,* 311 F.Supp. at 451.

The defendant's evidence regarding the Fort Howard machine is particularly unconvincing. The bids of Magna-Graphics and Paper Converting for the Fort Howard rewinder were quite comparable. This relatively small price differential may account for Mr. Dahlin's tentative and inconclusive statement that without the Magna-Graphics bid, Fort Howard might have turned to the used rewinder market instead of to Paper Converting.

With regard to the Scott machine, Thomas Cook's application of Scott's capital investment policy must be considered in light of discussions among the Oconto Falls plant manager and finishing engineers, held at the time the Magna-Graphics' bid was being evaluated. Although the difference in cost prompted Scott to move in Magna-Graphics' direction, it was observed by key Scott personnel that this price differential may not be overly significant but in future years may be negated by costs associated with a change in product line. The Court finds that in all reasonable probability, Paper Converting would have made the rewinder sales to Fort Howard and Scott had Magna-Graphics not made them, the difference in sales price to the contrary notwithstanding. "Lost profits" is an appropriate measure of damage in this case.

### B. *Incremental Income Approach*

The plaintiff urges the Court to employ an incremental costing method in calculating the profits lost by Paper Converting because of the infringement. According to the incremental approach, fixed costs—costs such as management salaries, property taxes, and insurance which do not vary with increases in production—are excluded in determining profits. These "incremental profits" thus recognize that it would not cost as much to produce unit 101 when the first 100 units produced already have paid the fixed costs.

The incremental income approach is well established in the law relating to patent damages and was used in *Paper Converting Machine Co., Inc. v. FMC Corporation,* 432 F.Supp. 907 (E.D.Wis.1977). In that case a master had been appointed to determine the amount of damages sustained by Paper Converting as a result of an infringement by FMC of a valid patent on perforators, machines used in rewinders to perforate paper into tearable toilet paper rolls. The independent accounting firm of Ernst & Ernst conducted an incremental cost analysis, allocating expenses between fixed and variable categories in order to arrive at an incremental profit, before taxes, on the lost sales of Paper Converting. In this case, Paper Converting has attempt-

ed to pattern its cost accounting methods after those used by Ernst & Ernst in the *FMC* suit.

Magna-Graphics contends that the incremental income approach should not be applied in this case because Paper Converting's income and cost calculations are based on speculative data and therefore are unreliable. Instead, the defendant offers a computation of damages based upon hard actual profit figures derived from Paper Converting's cost sheets for all of its sales of hardwound rewinders.

The first step in arriving at incremental income is to use Paper Converting's price for its comparable version of the infringing machine. In attempting an apples-to-apples comparison of rewinder prices, Paper Converting made what amounts to an educated guess to determine which cost items included in its price also were included in Magna-Graphics' price. In some instances, Paper Converting included in its price figure items that Magna-Graphics was uncertain to have included but that Paper Converting customarily would supply at the request of Scott and Fort Howard. For this reason Magna-Graphics argues that the Paper Converting price used was too high and should be discounted. Nevertheless, the Court finds that the Paper Converting price comparison is not so unreasonable or utterly without basis as to warrant a reduction.

Magna-Graphics contends, second, that the plaintiff's calculation of incremental income is unreliable because it is based only on the sales of Paper Converting's Green Bay, Wisconsin, plant. The plaintiff's Green Bay plant constitutes its parent company. Paper Converting has four wholly-owned manufacturing subsidiaries: one in England, one in Germany, and two in Green Bay. The two domestic manufacturers supply their parent with certain parts for the rewinder lines. In addition, the plaintiff also has three other nonmanufacturing subsidiaries.

Paper Converting's decision to use only the sales of the parent follows the practice in the *FMC* accounting. That practice is a sound one, and this Court will not depart from it.

As for the allocation of costs on a fixed and variable basis, the plaintiff has attempted as far as practicable to employ the *FMC* methodology. Magna-Graphics points out, however, that certain categories of expenses used in Paper Converting's calculations were developed after the *FMC* suit and thus not encountered in that prior accounting. The Court finds that the variations in expense and income entries between the *FMC* accounting and the instant accounting are not substantial enough to undermine the reasonableness of the plaintiff's allocation of fixed and variable costs.

■ In sum, the incremental income approach is an appropriate method of calculating the plaintiff's lost profits in this case. The additional increment of production needed by Paper Converting to replace the defendant's infringing sales is so small relative to the plaintiff's rewinder capacity that further fixed costs most probably would not be incurred. Furthermore, Paper Converting's cost accounting methodology, which follows the example set in the *FMC* accounting, is not so grounded in conjecture and speculation to justify abandoning incremental costing here in favor of an "actual profits" formula. The plaintiff's price comparison, its decision to focus on the sales of the parent company, and its allocation of fixed and variable costs are all sufficiently reliable to use as a basis for determining lost profits.

On the other hand, the instant accounting differs in one material respect from that in the *FMC* case, which difference calls for a slight adjustment of the plaintiff's calculations. The *FMC* accounting involved the infringing sales of rewinders that included the plaintiff's patented perforators. It does not appear that Ernst & Ernst's incremental costs analysis in that case distinguished between sales of hardwound and softwound rewinders. In the present case, however, Magna-Graphics argues with considerable logic that because the infringing sales involved only hardwound rewinders, the cost accounting

should be limited to the incremental profits for hardwound rewinder sales alone.

■ In calculating to a reasonable probability the incremental profits lost because of an infringing sale, the Court must posit a willing buyer and a willing seller who come together under conditions resembling those of the infringing sale. That is to say, what would the patent holder's incremental profit have been if he had stood in the infringer's shoes when the infringing sale was made? In this case, the infringements consisted of hardwound rewinder sales by Magna-Graphics to Scott in 1978 and to Fort Howard in 1981. The most reliable incremental analysis thus would be based upon data reflecting sales of those rewinders during those years.

Paper Converting determined that its incremental cost rate on all rewinders sold in 1978 was 58.1% of net sales. This figure was used to fix lost profits even though the plaintiff had calculated further that the incremental cost rate specifically on hardwound rewinder sales was 61.8%. Using the figure for all rewinder sales when the more reliable data for the hardwound machines was available is improper in this case. The Court will adopt an incremental cost rate of 61.8% in calculating the lost profits resulting from the rewinder sale to Scott.

With reference to Magna-Graphics' infringing sale to Fort Howard in 1981, Paper Converting again calculated its incremental cost rate on the basis of all rewinders it sold in 1981. It arrived at a figure of 60.8%. This incremental cost figure is even less reliable than was the figure for 1978 because Paper Converting did not sell any hardwound rewinders in 1981. This accounts for the plaintiff's failure to base its incremental analysis for 1981 on only hardwound rewinder sales.

■ In the Court's judgment, Paper Converting's 61.8% incremental cost of producing hardwound rewinders in 1978 is more reliable than the 60.8% figure representing the cost of producing softwound rewinders in 1981. Therefore, in the ab-

sence of data permitting an incremental calculation for 1981 that is limited to hardwound rewinder sales, the Court finds that the 61.8% cost rate for 1978 hardwound sales will generate a reasonably fair estimate of Paper Converting's total lost profits. In sum, the incremental cost rate adopted for the lost profits calculations to follow is 61.8%; the incremental income rate for both infringing sales, therefore, is 38.2%.

### C. The Fort Howard Rewinder

Having determined the methodology to be used in assessing damages against the defendant, the Court now must identify the infringing sales: specifically, whether the machine sold to Fort Howard constitutes an infringement, and whether the infringing acts consist of sales only of the rewinder apparatus itself or of all the components in the entire paper converting line.

Defendant Magna-Graphics obtained two orders for its rewinder line, one from Scott and one from Fort Howard. There is no dispute that the Scott rewinder was manufactured and sold before Paper Converting's patent expired. Magna-Graphics does argue, however, that the Fort Howard sale does not constitute an infringement because the machine sold to Fort Howard was not completely assembled within the life of the patent.

Magna-Graphics obtained an order for a rewinder line from Fort Howard on March 14, 1980, for delivery in March of 1981 or sooner. The order totaled $495,098 covering the rewinder, unwind, core loader, embosser, tail sealer, drive system, and miscellaneous parts. The only other bidder for the Fort Howard rewinder line was Paper Converting whose quotation, as conformed to the equipment provided by Magna-Graphics, was $546,313.

On February 26, 1981, this Court entered judgment against Magna-Graphics, holding Paper Converting's patent to be valid and infringed. By that time the Fort Howard machine was about 80% complete. Following the Court's decision, Magna-Graphics met and corresponded with Fort Howard in

an effort to fulfill the order yet avoid infringement. The initial action taken by Magna-Graphics was an attempt to change the construction to avoid infringement. In this regard, Magna-Graphics' counsel submitted three drawings to the plaintiff's counsel illustrating three proposed changes in construction and requesting an opinion as to whether the proposals would avoid infringement. The plaintiff stated that no opinion could be given as to whether the proposed changes avoided infringement until after the machine was built and viewed. This course of action was not feasible for Magna-Graphics because it would not be cost effective to design, engineer, and build a machine without knowing whether such machine would be considered to be an infringement by the plaintiff. On advice of counsel, Magna-Graphics contacted Fort Howard and negotiated to delay the assembly and delivery of the machine until after the expiration of the patent in April 1982. During this period, Magna-Graphics consulted with its attorneys on how to complete the machine without infringing.

### 1. Testing of the Fort Howard Machine

Before the Fort Howard rewinder was shipped, Magna-Graphics tested the machine to ensure that the moving parts would function as intended and at 1,600 feet per minute. It is customary in the trade for a rewinder machine to be fully tested and accepted in the manufacturer's plant before shipping. It is Paper Converting's practice, for example, to fully test its rewinders with the customer present, using a parent roll supplied by the customer, and to obtain customer acceptance before the machine is disassembled and shipped to the customer's plant. The testing of the Fort Howard machine at the Magna-Graphics plant did not follow this normal practice. The tests were run in two stages over a period of several weeks in July and August of 1981. They were designed to ready the machine for eventual shipment upon expiration of the Paper Converting patent and, at the same time, to comply with this Court's order of February 26, 1981.

To understand the testing procedure, it is helpful to understand the operation of the patented process whereby a continuous web of paper is severed from one roll and automatically transferred to another roll. Plaintiff's Exhibit 51, introduced at trial, is attached for reference. From within the 72-inch "cutoff roll" (item 44 of attached Exhibit 51), a full length blade ejects to cut the web which is wound around the "bed roll" (item 72 of the attached Exhibit 51). Pins attached to the bed roll then hold the severed edge of the web while pushers, also attached to the bed roll, transfer the leading edge of the web to a third, smaller roll called a mandrel. See attached plaintiff's Exhibit 51, Figure 5 of defendant Scott's machine. The patent claim thus consists of three elements operating in combination: the cutting blade, the pins, and the pusher pads. See attached plaintiff's Exhibit 51, Elements 1–3 of the patent claim.

Magna-Graphics used a two-step testing procedure that tested, first, the bedroll to determine whether the pushers actuated properly and, second, the cutoff roll to determine whether the cutting blade actuated as intended. At no time during the tests were the pins, the blade, and the pushers installed and operating together.

In the first phase of the test, two pads were installed on the bed roll instead of the thirty pads normally used in an operating machine. The pads were greased, and the bed roll was operated to determine whether the pads, when unlatched, would contact the core on the mandrel. When the pusher actuating mechanism was tested in this way, no cutoff blades or pins were installed in the cutoff roll. Compare Figures 9 of attached plaintiff's Exhibit 51.

The knife actuating mechanism then was tested by installing a short 4-inch section of

cutter blade into the cutoff roll as compared to a 72-inch blade normally used in the machine. A piece of paper approximately four inches wide was taped to the outer surface of the cutoff roll, and the cutoff roll was operated to determine whether the latch mechanism would eject the blade to cut the paper. In this phase of the testing, no pins and no pusher pads were installed in the bed roll. Compare Figures 7 of attached plaintiff's Exhibit 51.

■ Despite this piecemeal testing of the Fort Howard rewinder, Magna-Graphics encountered substantial problems with the machine after its installation in Fort Howard's Oklahoma facility. Changes were required in the latching mechanisms of both the bed roll and the cutoff roll as well as in the pads and pins themselves. Indeed, the machine was not accepted at Fort Howard until November of 1982. These post-installation difficulties, however, will not be given significant weight by this Court. That the machine did not operate well when installed in Oklahoma and that the problems might have been avoided if the rewinder had been fully tested are facts which do not carry great probative value whether the Fort Howard machine constituted an infringement. An allegedly infringing device that operates less efficiently or fails to realize all the advantages of the invention does not thereby avoid infringement. *Paper Converting Machine Co. v. Magna-Graphics Corporation,* 680 F.2d 483, 497 (7th Cir.1982).

2. Shipment of the Fort Howard Machine

To ensure even further that continued action on the Fort Howard order would avoid patent infringement, Magna-Graphics on advice of counsel negotiated special shipment and assembly details with Fort Howard. Pursuant to a letter agreement approved by counsel for Magna-Graphics, the cutoff and transfer mechanism was not to be assembled in the rewinder but was to be shipped separately to Fort Howard. Moreover, the patented mechanism was not to be assembled with the rewinder until April 22, 1982, when the patent expired.

Thus, on September 17, 1981, the basic rewinder machine was shipped to Fort Howard; the cutoff roll and bed roll were separately crated and shipped on October 23, 1981. On April 26, 1982, the crates containing the two rolls were opened and installed in the machine at the Fort Howard plant.

3. Conclusions of Law

■ A patent owner can recover only for acts of infringement committed after the date of issuance and before the date of expiration of the patent. In *Deepsouth Packing Co. v. Laitram Corp.,* 406 U.S. 518, 528, 92 S.Ct. 1700, 1707, 32 L.Ed.2d 273 (1972), the Supreme Court reiterated the well established principle that "a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts." The patent in suit in this case protects a novel operation that combines three elements—knives, pins, and pushers—in a cutoff and transfer process. Although the manufacture of all the elements is not an infringement, an "operable assembly" of those elements during the life of the patent is an infringement.

■ During the testing of the Fort Howard machine in July and August 1981, Magna-Graphics completed an operable assembly of the infringing rewinder. It is not essential that the machine actually be operated with a continuous web. Similarly, it is not decisive that the pins were not installed during the testing. Both the bed and cutoff rolls were assembled and were operated when the machine was tested. The Paper Converting patent in this case must be construed broadly in scope to reach equivalents. The Court holds that Magna-Graphics' two-stage testing of the

patented cutoff and transfer process amounts to the function equivalent of an operable assembly. The sale of the Fort Howard rewinder constitutes an infringement as a matter of law.

### D. *The Entire Market Value Rule*

Paper Converting contends additionally that its lost profits should be calculated on the sales of the entire rewinder machine to Scott and Fort Howard rather than on the sales of only the patented rewinder part itself. As mentioned earlier, the mechanism for the high speed manufacturing of paper rolls comprises several features, only one of which is the rewinder device that contains the patent-in-suit. Other auxiliary equipment used with the rewinder includes an unwind stand for supporting a large roll of paper supplied to the rewinder for cutting and rewinding as smaller rolls of paper. In addition, a core loader is provided to supply paperboard cores to the rewinder on which the paper is wound. Further, an embosser may be located between the unwind stand and the rewinder to emboss the paper and provide a special textured surface. In certain installations, a tail sealer also is utilized in conjunction with the rewinder to seal the trailing end or tail of the wound paper as it emerges from the rewinder.

■ The infringing rewinder sales to Scott and Fort Howard included sales of the above-described auxiliary equipment. Paper Converting seeks an award of the profits it lost on the sales to Scott and Fort Howard of all components of the rewinder line pursuant to the "entire market value" rule. This rule allows recovery of damages based on the value of an entire apparatus containing several features, even though only one feature is patented. The entire market value rule applies only when the patent owner can demonstrate that the entire marketable value of the total apparatus is attributable to the patented feature. *See National Rejectors v. A.B.T. Mfg. Corp.*, 188 F.2d 706, 709 (7th Cir.1951).

Magna-Graphics emphasizes that the auxiliary equipment are separate and distinct items having a separate usage; they are not integral parts of the rewinder but are connected to it only through the overall drive system.

■ The evidence adduced at trial by Paper Converting is sufficient to sustain its burden of showing that the entire market value of the rewinder lines sold to Scott and Fort Howard is properly attributed to the patent-in-suit. The evidence of record indicates a solid industry practice of purchasing rewinders along with the auxiliary equipment used in the line. Whether customers in the marketplace would ever buy the auxiliary components without the patented rewinder is a relevant factor in applying the entire market value rule.

Purchasing the entire rewinder line together helps customers ensure a single source of responsibility, and both Scott and Fort Howard had a history of buying rewinder lines from Paper Converting. Whenever Paper Converting sold Fort Howard a high speed (68″) automatic rewinder, all the auxiliary equipment accompanied the sale. Fort Howard did purchase narrow (40″) slower speed rewinders from Paper Converting without other components because Fort Howard had its own design for the unwind stand. Magna-Graphics' infringing rewinder sale to Fort Howard, however, was of the high speed variety, for which the Fort Howard unwind design was unsuitable. This higher speed rewinder was necessary to meet Fort Howard's 1,600 feet per minute speed requirement. The infringing sale included all the auxiliary equipment.

Similarly, Paper Converting supplied all the auxiliary equipment to Scott for sales of hardwound rewinders. On only three occasions did Paper Converting supply only new rewinders to Scott; in those instances, Paper Converting sold three softwound rewinders to Scott with the unwind stands being purchased from Magna-Graphics. And even in these sales, Scott bought core

loaders and tail seals from Paper Converting. Indeed, Paper Converting sold 90–95% of its 572 rewinder sales as complete lines, and only nine sales involved rewinders alone. The infringing sale to Scott, like the sale to Fort Howard, included the entire rewinder line.

Magna-Graphics makes much of the fact that Paper Converting owns six patents in the rewinder line, and that the plaintiff has not shown the entire market value of the rewinder lines to be traceable to the specific patent-in-suit rather than to any of the five other patents.[2] This argument is not persuasive and is rejected. It reasonably appears from the record that the patented cutoff and transfer process in the plaintiff's rewinders is a prerequisite to their marketability and that the presence of other patented features does not render inapplicable the entire market value rule in this case. The Court holds that Magna-Graphics is responsible for the profits Paper Converting lost on sales of the entire rewinder line to Scott and Fort Howard.

### E. Calculation of Damages

In the instant accounting for damages, Paper Converting is entitled to recover its lost profits, calculated on the basis of its incremental cost. These damages will consist of the profits lost by the plaintiff as a result of Magna-Graphics' sale of rewinder lines to Scott in 1978 and to Fort Howard in 1981.

To determine the incremental profit Paper Converting would have made on the sale of the Scott rewinder line in 1978, the conformed selling price of $407,353 is reduced by the incremental cost for an additional rewinder. This Court has determined the incremental cost rate in this case to be 61.8%. The incremental cost on the

Scott machine, therefore, is $251,744. Reducing the selling price by the incremental cost yields $155,609 incremental profit before year-end officers' compensation and profit sharing. In the *FMC* accounting, both officers' compensation and profit sharing costs were found to be proper deductions from incremental profit. Subtracting a 9.9% officers' compensation rate and a 20% profit sharing rate, figures which the defendant does not contest, a before-tax incremental profit of $112,163 is reached. These calculations are reflected in the following chart:

### CALCULATION OF INCREMENTAL INCOME PAPER CONVERTING MACHINE COMPANY WOULD HAVE MADE ON INFRINGING SALE

#### SCOTT MACHINE

| | |
|---|---|
| Paper Converting Machine Company's selling price for machine equivalent to infringing machine | $407,353 |
| Incremental cost rate | 61.8% |
| Incremental costs | $251,744 |
| Incremental income before year-end officers' compensation, Profit Sharing and income taxes | $155,609 |
| Year-end officers' compensation rate | 9.9% |
| Year-end officers' compensation | $ 15,405 |
| Incremental income before Profit Sharing and income taxes | $140,204 |
| Profit Sharing rate | 20% |
| Profit Sharing | $ 28,041 |
| Incremental income before income taxes based on Paper Converting Machine Company's incremental cost rates | $112,163 |

Following the same procedure for the Fort Howard rewinder line and using the same incremental cost rate of 61.8%, the incremental profit on the sale is $145,583.

---

**2.** Patent 3,064,862 is directed to a valve structure for a rewinder; Patent 3,079,359 relates to a core loader; Patent 3,116,890 relates to a rewinder; Patent 3,259,323 relates to an adhesive applying apparatus for a rewinder; and Patent 3,733,949 relates to a perforator apparatus.

The following chart illustrates this calculation:

### CALCULATION OF INCREMENTAL INCOME PAPER CONVERTING MACHINE COMPANY WOULD HAVE MADE ON INFRINGING SALE

### FORT HOWARD MACHINE

| | |
|---|---:|
| Paper Converting Machine Company's selling price for machine equivalent to infringing machine | $546,313 |
| Incremental cost rate | 61.8% |
| Incremental costs | $337,621 |
| Incremental income before year-end officers' compensation, Profit Sharing and income taxes | $208,692 |
| Year-end officers' compensation rate | 12.8% |
| Year-end officers' compensation | $ 26,713 |
| Incremental income before Profit Sharing and income taxes | $181,979 |
| Profit Sharing rate | 20% |
| Profit Sharing | $ 36,396 |
| Incremental income before income taxes based on Paper Converting Machine Company's incremental cost rates | $145,583 |

For both the Scott and Fort Howard sales, the profits are based on all of the equipment on the order to Magna-Graphics because neither Scott nor Fort Howard would have purchased any of the auxiliary equipment from Magna-Graphics had Magna-Graphics not been able to provide the infringing rewinder. Total lost profits on the two rewinder lines, therefore, are $257,-746 which, when trebled, yields $773,238.

■ When the patent holder is a manufacturer and its actual damage can be ascertained, it is unnecessary to apply the principle of reasonable royalty. The patent statute nevertheless requires that the damages be not less than a reasonable royalty. A 20% reasonable royalty is proper. *See Paper Converting Machine Company, Inc. v. FMC Corp.*, 432 F.Supp. 907, 916 (E.D.Wis.1977). Magna-Graphics sold the Scott and Fort Howard machines for $231,-835 and $495,098, respectively. A 20% royalty on the total sales price of $726,933 is

$145,387. When this royalty figure is trebled, $436,160 is reached. The damages assessed in this accounting, therefore, exceeds what a reasonable royalty would provide.

### F. *Prejudgment Interest*

[18, 19] In addition to the award of lost incremental profits, the plaintiff seeks compensation in interest for the loss of use of that money from the date of each infringement to the date of this judgment. In *General Motors Corp. v. Devex Corp.*, — U.S. ——, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983), the Supreme Court stated that 35 U.S.C. § 284 gives a court general authority to fix interest and costs in patent cases, and the exercise of that authority is not restricted to exceptional circumstances. Rather, "prejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." *Id.* This does not mean that prejudgment interest should be awarded whenever an infringement is found; section 284 affords the Court discretion in awarding interest depending upon the circumstances of the particular case. *Id.* 2063.

■ The Court finds that an award of prejudgment interest is appropriate in this case. The interest shall be calculated from the date of each infringement at 12%, which is the current Wisconsin interest rate on judgment awards. *See* Wis.Stat. § 814.-04(4). Magna-Graphics does not contest the assessment of interest on the plaintiff's before-tax incremental income; the defendant argues only that the interest award, if any, should run from the Seventh Circuit's decision affirming this Court's liability determination. In the Court's opinion, however, it is appropriate for the interest in this case to run from the dates Paper Converting would have delivered its machines to Scott and Fort Howard.

The interest calculation thus amounts to $119,826 and is illustrated by the following chart:

CALCULATION OF PAPER CONVERTING MACHINE COMPANY'S
LOST INTEREST ON INCREMENTAL INCOME

|  | Scott Machine | Fort Howard Machine |
|---|---|---|
| Order dates | 22 Sept. 77 | 26 Mar 80 |
| Paper Converting Machine Company's delivery dates based on quoted deliveries of 9–10 months and 11 months, respectively | 22 July 78 | 26 Feb 81 |
| Incremental income before taxes | $112,163 | $145,583 |
| Lost interest from shipment to 22 Nov. 1983 as calculated below | $ 71,784 | $ 48,042 |
| Combined lost interest | | $119,826 |

Scott Machine
$112,163 x 12% x 5 years 4 months =  $ 71,784
Fort Howard Machine
$145,583 x 12% x 2 years 9 months =  $ 48,042

## II.  ATTORNEYS' FEES

■ In addition to assessing the measure of damages due Paper Converting under 35 U.S.C. § 284, this Court must determine whether a further award of attorneys' fees is appropriate.  The patent statute relating to awards of attorneys' fees is 35 U.S.C. § 285 which states that "[the] court in exceptional cases may award reasonable attorney fees to the prevailing party."  Attorneys' fees are awarded only in exceptional patent suits to prevent gross injustice when fraud and wrongdoing are clearly demonstrated.  The infringer's conduct must be clearly inequitable.

The plaintiff's motion for attorneys' fees is based not on this Court's finding of willful and deliberate infringement by Magna-Graphics but on allegations of Magna-Graphics' misconduct in its defense of the patent claim.  Specifically, Paper Converting charges that the defendant has asserted sham defenses on the issues of patent infringement and patent validity in the liability trial and on the "entire market value" question in this accounting action.  The defenses are described by the plaintiff as frivolous and brought in bad faith.

■ Having reviewed the record in this action and in the liability phase, the Court does not find the "unambiguous showing of extraordinary misconduct" that would justify an award of attorneys' fees under 35 U.S.C. § 285.  *See Airtex Corp. v. Shelley Radiant Ceiling Co.*, 536 F.2d 145, 155 (7th Cir.1976).  The plaintiff's motion is denied.

## III.  SUMMARY OF AWARD

Paper Converting is hereby awarded $112,163 as damages for the infringing sale of the Scott machine and $145,583 as damages for the infringing sale of the Fort Howard machine.  The total award of lost profits, therefore, is $257,746, which when trebled amounts to $773,238.  To this sum must be added an award of prejudgment interest totaling $119,826.  The full award thus amounts to $893,064.

### ORDER

NOW, THEREFORE, IT IS ORDERED pursuant to 35 U.S.C. § 284 that judgment shall be entered in favor of the plaintiff in the amount of $893,064 as damages for the defendant's infringement of the patent-in-suit.

IT IS FURTHER ORDERED that the plaintiff's motion for an award of attorneys' fees under 35 U.S.C. § 285 hereby is denied.

**DEFENDANT'S SCOTT MACHINE**
ADJUDICATED INFRINGEMENT FEBRUARY 26, 1981

FIG 7

FIG 9

982

DEFENDANT'S SCOTT MACHINE
ADJUDICATED INFRINGEMENT FEBRUARY 26, 1981

CHART SHOWING WHEREIN
MECHANICAL ELEMENTS OF CLAIM I OF NYS'
RE. 28,353 (EXPIRED APRIL 20,
PREVIOUSLY FOUND IN DEFENDANT'S S
ARE FOUND IN DEFENDANT'S FT. HOW

| ELEMENT NO. | | MECHANICAL ELEMENTS OF HYSTRAND ET AL PATENT RE 28, AS DESCRIBED IN CLAIM 1 |
|---|---|---|
| INTRO. | A | IN WEB-WINDING APPARATUS EQUIPPED WITH |
| | B | A FRAME, |
| | C | A ROLL ROTATABLY SUPPORTED ON SAID |
| | D | MEANS FOR ROTATING SAID ROLL, |
| | E | MEANS FOR FEEDING A WEB ONTO SAID TRAVEL THEREWITH WHILE IN PARTIAL W ENGAGEMENT WITH SAID ROLL, |
| | F | SAID FRAME ALSO BEING EQUIPPED WITH A PLURALITY OF MANDRELS, |
| | G | MEANS FOR MOVING SAID MANDRELS SEQ THROUGH A PATH IN CLOSE PROXIMITY SURFACE OF SAID ROLL, |
| | 1 | THE IMPROVEMENT COMPRISING: MEANS FOR TRANSVERSELY SEVERING SAI TO PROVIDE A FREE LEADING EDGE ON FOR APPROACHING A MANDREL ON WHI WEB IS TO BE WOUND IN SAID PATH, |
| | 2 | PIN MEANS EXTENSIBLY MOUNTED ON SAID ROLL FOR MAINTAINING A WEB PORTION SP, FROM SAID EDGE IN CONTACT WITH S, ROLL, AND |
| | 3 | PUSHER MEANS EXTENSIBLY MOUNTED ON SAID ROLL TO URGE SAID MAINTAINED WEB PORT AGAINST AN ADJACENT MANDREL. |

FIG 3

FRAME 102
(Uncolored)

BED ROLL 18
(Colored Yellow)

MOTOR
(Colored Yellow)
PULLEY, DRIVE BELT

TENSIONING STATION 8,
ROLLERS 12, 13, ROLLS 16, 19, 21
(Colored Pink)

MANDRELS 22
(Colored Orange)

TURRET 23
(Colored Orange)

KNIFE 33, CUTTING BAR 34
(Colored Dark Green)

PINS 32
(Colored Light Green)

PADS 38
(Colored Blue)

FIG. 4

FIG. 5

102

RAND ET AL PATENT

9 82)

COTT MACHINE

RD MACHINE

FIG. 3

FIG. 4

FIG 5

153

FRAME,

ROLL FOR
APPING

ITH

UENTIALLY
O THE

D WEB
SAID WEB
CH SAID

CED
ID

ON

ADMITTED - SEE FIG. 3
MODIFIED PER RA 10
OF SEPT. 10, 1982

FUNCTIONS THE SAME AS IN SCOTT MACHINE
EXCEPT INSTALLED SEQUENTIALLY FOR TESTING
(SEE FIGS. 7 & 9)
THEN ALL INSTALLED IN ROLLS WHICH WERE
CRATED SEPARATELY FOR SHIPMENT

**984**

<u>DEFENDANT'S FT. HOWARD MACHINE</u>

SHIPPED SEPTEMBER 17, 1981 WITHOUT BED & CUT-OFF ROLLS
BED & CUT-OFF ROLLS SHIPPED OCTOBER 23, 1981

PLAINTIFF'S
EXHIBIT
57

FT. HOWARD MACHINE COMPLETE
WITH BED & CUT-OFF ROLLS TESTED
IN SUMMER 1981 IN DEFENDANT'S PLANT IN TWO STAGES

ONE STAGE WAS TO TEST THE KNIFE ACTUATING MECHANISM

WITH PUSHER REMOVED - BOLTS REMOVED FROM HOLES 64ᵃ ————

WITH PINS ABSENT - BOLTS NOT INSTALLED IN HOLES 32ᵇ ————

BUT WITH A CUT-OFF BLADE SEGMENT 33 INSTALLED ON CARRIER ELEMENT 42ᵃ
ALONG WITH A FORCING BAR SEGMENT 36 AND WITH A 4" LENGTH OF
WEB W TAPED TO THE BEDROLL OPENING OVER CUTTING BAR 34

FIG. 7

THE OTHER STAGE WAS TO TEST THE PUSHER ACTUATING MECHANISM

WITH CARRIER ELEMENT 42ᵃ REMOVED FROM SHAFT 42

COMPARE FIG. 7 ABOVE WITH FIG. 7 BELOW

BUT WITH TWO PUSHERS 38 INSTALLED BY INSTALLING BOLTS
IN HOLES 64ᵇ AND A CORE 24 ON MANDREL 22

FIG. 7
(IN PART)

FIG. 9