**PAPER CONVERTING MACHINE COMPANY, Plaintiff,**

v.

**MAGNA–GRAPHICS CORPORATION, Defendant.**

**C.A. No. 79–C–499.**

United States District Court, E.D. Wisconsin.

May 30, 1985.

See also, Fed.Cir., 788 F.2d 1536.

---

Jerome F. Fallon, Tilton, Fallon, Lungmus & Chestnut, Chicago, Ill., and Franklyn M. Gimbel, Gimbel, Gimbel & Reilly, Milwaukee, Wis., for plaintiff.

Glenn O. Starke and Eugene R. Sawall, Andrus, Sceales, Starke & Sawall, Milwaukee, Wis., for defendant.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This is an action for patent infringement arising under the patent laws of the United States, Title 35 U.S.C. The plaintiff Paper Converting Machine Company ("Paper Converting") holds a patent covering a machine that rewinds toilet paper stock and paper towel stock from a parent roll onto smaller consumer rolls. After a court trial the validity of the patent was upheld, a willful infringement was found, and the Court awarded treble damages and injunctive relief against the defendant, Magna-Graphics Corporation ("Magna-Graphics"). 211 USPQ 788 (E.D.Wis.1981); aff'd 680 F.2d 483 (7th Cir.1982).

In the accounting phase of the trial, the Court found that Magna-Graphics made two sales of infringing rewinders, and awarded $112,163.00 as damages for the infringing sale of the Scott machine and $145,583.00 as damages for the infringing sale of the Fort Howard machine. The

total award of lost profits was trebled and $119,826.00 was awarded as prejudgment interest for a total award of $893,064.00. 576 F.Supp. 967 (E.D.Wis.1983).

On appeal, the Court of Appeals for the Federal Circuit vacated that portion of the judgment trebling the damages on the Fort Howard machine and remanded the case to this Court for a determination of willfulness. 745 F.2d 11, 24 (Fed.Cir.1984). The Fort Howard machine was only 80% completed when the injunction was issued at the conclusion of the liability phase of this trial. The finding of willful infringement was made at the liability phase, and the machine was completed and tested prior to the accounting phase. Noting the factual difference between Magna-Graphic's actions in regard to the two machines, the appellate court remanded the case for additional findings as to the willfulness of Magna-Graphic's post-injunction activities. *Id.* at 20.

After the Court's decision and order following the liability phase was issued, Magna-Graphics considered various options to enable it to complete the Fort Howard machine without infringing the patent at issue. Magna-Graphics ultimately performed a two stage testing procedure which was held to be an infringement under the doctrine of equivalents. This ruling was affirmed by the Court of Appeals for the Federal Circuit. The issue on remand is whether there was a willful infringement in the testing of the Fort Howard machine, and more specifically, whether Magna-Graphics behaved unreasonably in view of the totality of the circumstances in not obtaining an opinion of counsel on the specific testing procedure.

A hearing on remand was held on January 14, 1985, at the conclusion of which the Court directed both parties to submit proposed findings of fact and conclusions of law. On the basis of these submissions, the testimony and other evidence adduced at the hearing, and the arguments of counsel, I conclude that the post-injunction testing of the Fort Howard machine constitut-

ed a willful infringement of the Paper Converting patent.

Magna-Graphics contends that it worked closely with its attorney in its efforts to complete the Fort Howard machine without infringing the patent and violating the injunction. On the issue of testing, Magna-Graphics was generally advised not to assemble the whole infringing combination, at least not within the United States. In light of this advice, Magna-Graphics employees devised and conducted the two-stage testing procedure at issue; but the attorney was never consulted as to whether this specific procedure would infringe the patent, nor was a written opinion requested.

This case differs from other cases on willful infringement because Magna-Graphics had already been found to have infringed the patent at issue and had to be especially careful to avoid contempt. Nonetheless, Magna-Graphics acted on oral opinions of counsel which were presented in generalized terms, without requesting further elaboration after the specific test procedure was conceived and implemented. I find that a reasonably prudent person would have checked the specific test procedure with counsel, especially when acting under an injunction, and would have obtained a written opinion of counsel for the inevitable day in court. Consequently, I can only conclude that under the totality of the circumstances, Magna-Graphics post-injunction infringing activities were willful.

In the accounting phase of this action, the Court denied Paper Converting's motion for attorneys' fees pursuant to 35 U.S.C. § 285. 576 F.Supp. at 980. In remanding the case for further findings the appellate court noted that if the continued infringement was willful, it was done in contempt of court, and remedies beyond the trebling of damages may be appropriate. 745 F.2d at 20, 21. Pursuant to this direction, Paper Converting has moved for an award of attorneys' fees and expenses for the time spent proving an infringement for the Fort Howard machine under the general equity power of the Court relating

to contempt. I find that the treble damage award which is hereby reinstated is adequate under the circumstances, and the motion for attorneys' fees will be denied.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the discussion above shall constitute a portion of the Court's findings of fact and conclusions of law. In addition, the Court makes the following specific findings of fact and conclusions of law which are adapted with minor modifications from those submitted by the plaintiff.

## FINDINGS OF FACT

1. The patent-in-suit Reissue No. 28,353 pertains to a rewinder for toilet paper and toweling where high speed operation is achieved by separating the steps of web cutoff and transfer of the cut web to the core of a new roll. The Scott machine embodied the patented cutoff and transfer mechanisms and was adjudicated an infringement in the Court's Judgment of February 26, 1981. Magna-Graphics was immediately apprised of the Court's judgment and filed a motion on March 2, 1981 under Fed.R.Civ.P. 60(b) to amend the Court's findings relative to willful infringement and treble damages.

2. When Magna-Graphics learned of the judgment, the Fort Howard machine was approximately 80% complete and a cutoff and transfer mechanism similar to that in the Scott machine was proposed for the Fort Howard machine. However, the Fort Howard cutoff and transfer mechanisms had not been installed and tested.

3. Thereupon, Magna-Graphics undertook consideration of substitute cutoff and transfer mechanisms which would not be infringing. This was with the approval of Fort Howard who met with Magna-Graphics on March 16, 1981:

"We expect to hear from you on March 20, 1981, regarding the possibility of temporarily substituting a non-infringing cutoff and transfer mechanism in the winder."

4. On March 31, 1981 Fort Howard and Magna-Graphics conferred, the confirmation of Fort Howard stating:

"This will confirm our phone conversation of today, in which I advised you that we agree to a one month extension on the delivery of the hardroll towel winder you are furnishing against this purchase contract. This also confirms that you will send us a letter bringing us up to date on the status of the pending litigation and your efforts to resolve the problem of delivery of the hardroll towel winder. I would like to reemphasize the importance of keeping us informed of all actions you are taking in this matter."

5. On April 1, 1981, Magna-Graphics wrote Fort Howard about its plans for changing the machine. Five alternative methods of cutoff and transfer were being considered including air blast assistance, physical hold-down of the web, and flying splice. Magna-Graphics advised Fort Howard that all these alternatives would be presented to its counsel, Messrs. Custin and Nilles on April 3, 1981.

6. Attorneys Custin and Nilles traveled to Oconto Falls, Wisconsin on April 3, 1981 and met with Magna-Graphics president Leanna, its vice presidents Wittkopf and Jorgensen and its project engineer Nehring. According to the testimony at the remand hearing of January 14, 1981 of Messrs. Custin and Leanna, the following subjects were discussed: a supersedeas bond, not completing the Fort Howard machine and modifications to the machine.

7. At the remand hearing, Mr. Custin stated that at the April 3, 1981 conference he was:

"(M)ost emphatic to my client about staying out of a possible contempt situation." (Tr. 27)

8. Also at the April 3, 1981 conference, Mr. Custin gave a lecture on the decision in *Deepsouth Packing Co. v. Laitrim Corp.*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972) (Tr. 27, 72).

Each time Mr. Custin mentioned the *Deepsouth* case in his testimony—which he referred to as the *Laitrim* case—he cou-

pled it with a discussion of the decision in *Radio Corporation of America v. Andrea,* 79 F.2d 626 (2d Cir.1935); 90 F.2d 612 (2d Cir.1937). (Tr. 27–8, 38–46) Representative of his testimony is the following (Tr. 38):

> "This is something that I am sure I made it clear to the client right from the start, because as I said, I was familiar with this Laitram case and I was familiar with the much earlier RCA case. In fact, the RCA case which is probably referred to in the Laitram case was really the thing that was sticking in my mind. All they did was put the vacuum tubes in the sockets and they were in trouble. Laitram said, well, if you didn't put the tubes in the sockets, then everything was fine."

9. The Court finds that from the outset, Mr. Custin was deeply concerned about the possibility of contempt and also the problems that could arise from any testing of the Fort Howard machine—and further that he communicated these concerns to Magna-Graphics.

10. The principal objective of Magna-Graphics in the spring of 1981 was to come up with a non-infringing substitute for the patented cutoff and transfer (Tr. 72–3).

11. On April 20, 1981, this Court issued a supplemental opinion and order ruling on the Magna-Graphics motion under Fed.R. Civ.P. 60(b). In that memorandum and order, the Court discussed the relationship of a lawyer's opinion on infringement to the issue of treble damages. This memorandum and order was considered both by Magna-Graphics' officers and its counsel. The Court finds that a reasonably prudent person, upon receiving such an order—discussing not only the lack of an opinion but emphasizing that all of the facts are important in finding deliberate infringement—would certainly exercise extreme caution in whatever was proposed to be done to the Fort Howard machine.

12. On May 8, 1981, the Magna-Graphics attorneys reported on searches of the prior art they had conducted into alternative cutoff and transfer mechanisms. One of these was a vacuum hold down replace-ment system. (Tr. 32) Thereafter, on May 12, 1981, Magna-Graphics sent to its attorneys drawings showing the use of vacuum in place of the pins in the Fort Howard machine. These were specifically considered by the Magna-Graphics attorneys on May 13, 1981.

13. On May 15, 1981, Fort Howard and Magna-Graphics met to discuss the vacuum system and in confirming this meeting, Fort Howard said in its letter of May 20, 1981:

> "We would like you to provide us a copy of your attorney's opinion concerning the new design ..."

14. The Court finds that this was still another signal to Magna-Graphics to be extremely cautious in proceeding because a highly regarded customer emphasized the need for reviewing an attorney's opinion.

15. On May 19, 1981, Magna-Graphics' attorney Custin sent a letter to Paper Converting's attorney Fallon about the proposed vacuum system and enclosed three drawings, the letter reading:

> "You will recall that in a telephone conversation a while back you asked me what Magna-Graphics was going to do about delivery of a rewinder to Ft. Howard, and I replied that Magna-Graphics intended to produce and deliver a machine that would be outside the scope of the Nystrand et al Patent No. Re 28.353; and I said that Magna-Graphics had several alternatives under consideration.
>
> At this stage no definite decision has been made, but the number of alternatives under consideration has been reduced.
>
> The enclosed drawings depict one such proposal. The others that are still being considered have not yet been advanced to the point of being represented by suitable drawings.
>
> It would undoubtedly save time and effort for all concerned if you could review the enclosed drawings and let me know whether or not you agree that the structure depicted on them would be outside the scope of the claims."

Mr. Custin testified (Tr. 37–8) that he felt the *slowness* of operation would be a problem with the vacuum system.

16. Upon receipt of attorney Custin's letter of May 19, 1981, the drawings were submitted to John J. Bradley, Paper Converting's engineering vice president to determine how the vacuum system would operate (Tr. 109). Mr. Bradley made an evaluation that the vacuum system was an unacceptable arrangement—that it would not function at a commercially acceptable speed (Tr. 102).

17. Paper Converting knew of Magna-Graphics' unsuccessful attempts in using a vacuum system during the period March through the end of 1977 in designing the Scott machine—this having been brought out at the liability trial on November 4, 1980 at transcript page 270–1. Thereafter, Magna-Graphics turned to the infringing cutoff and transfer mechanism for the Scott machine, having "aborted" the vacuum system. Paper Converting did not know that Magna-Graphics knew of the speed limitation of the vacuum system (Tr. 38). However, Paper Converting did know from attorney Custin's letter that Magna-Graphics had other "alternatives" under consideration.

18. The foregoing considerations led Paper Converting's attorney Fallon to respond to attorney Custin's letter on May 29, 1981:

"Responsive to your letter of May 19, we regret that we cannot advise you whether the proposed machine avoids or comes under the patent. In view of the past attitude of Magna-Graphics toward vacuum, it would seem advisable to see the machine in operation before making any decision."

The Court finds that this was a reasonable response under the circumstances and that Paper Converting did not thereby undertake to put Magna-Graphics in a position of disadvantage.

19. The Fort Howard machine was tested in the summer of 1981, more particularly in the period July 16-July 31 as specified in the Magna-Graphics letter of July 15, 1981 to Fort Howard. That letter also specified:

"The winder will be tested without the allegedly patent infringing parts, which are the pins, transfer pads and knives."

The letter went on to say:

"Therefore, the tests at MGC will only involve the functions of the electrical and mechanical portions of the winder without using the pins, transfer pads and knives."

Thereafter, the machine was tested in two stages, one stage making use of a single 4″ knife (in contrast to the 72″ width knives proposed) and without pins and pushers. In the other phase, two pushers (as contrasted to 36 in the design) were tested—this without any pins or knives (Tr. 100–1).

20. Attorney Custin was the only attorney involved after the substitute mechanism phase was concluded, and he testified that he did not recall giving any advice on using knives in testing without pins and pushers and, also, that he did not recall giving any advice on testing the pushers without pins and knives. Mr. Jorgensen who devised the test did not consult counsel (Tr. 97–8).

21. The testing was very specific and detailed. First, 2 of 36 pads were tested, i.e., $\frac{1}{18}$ of the total (Tr. 100). And these were equipped with a "grease type of product" to see if, upon emergence, they would touch the core (Jan. 1983 Tr. 252–3). Thereafter a 4″ blade (out of a possible 72″—again $\frac{1}{18}$) was tested against a length of paper pasted over the bed roll slot (Tr. 101).

22. The Court finds that the disclosure of this carefully-crafted test would not readily be forgotten. All that Mr. Custin was clear on was that Magna-Graphics should not test with the completed assembly (Tr. 41–2). He did not address any specific testing procedure (Tr. 38–39). And most importantly he did not recall addressing the actual testing procedure followed (Tr. 44):

"Q. Did you advise Magna-Graphics that it would not be an infringement to

test the pushers when the knives and pins were absent?

A. I don't recall whether I did or not. I don't recall that specific question came up or not.

Q. Did you advise Magna-Graphics that it would not be an infringement to test a knife when the pushers and pins were absent?

A. Again, I don't recall whether that specific question came up or not."

23. The Court finds that at no time did Magna-Graphics ask its counsel and that at no time was there an opinion that testing "some but not all" of the pins, pads and knives would avoid infringement. The only testimony on this more general question was that of Mr. Leanna (Tr. 76–7):

"Q. And you didn't ask Mr. Custin specifically about testing with less than all of the allegedly infringing elements?

A. No, I am not saying—I am not stating that. At the time that the tests were being conducted, I don't know—if we are looking for timing areas, I don't know if the day or the week before or two weeks before a particular test was conducted, whether or not Mr. Custin was consulted. But I know we did have many discussions prior to the testing and shipping of the Fort Howard machine as to what constituted an infringement in the machine and what parts could be put together or what items could be run without infringing the patent."

The Court finds this answer to be ambiguous—there were "discussions" but no positive advice on what could or could not be done.

24. The Court finds that whatever inference might be drawn from Mr. Leanna's testimony quoted immediately above is negatived by his testimony at the 1983 accounting trial:

"A. Well, it relates to the winder in question for Fort Howard, stating to Fort Howard that we basically can't put all the infringing parts in the machine and that the machine would be run without *any* of the infringing parts in the machine." (Emphasis supplied.)

25. In view of the totality of the circumstances in the period March-July: (1) the threat of possible contempt, (2) the coupling of the *Deepsouth* justification with the caveat against testing of the *RCA* case, (3) the denial of the motion to delete findings on willful infringement, and (4) the request of an opinion by Fort Howard, the Court finds that a reasonably prudent person in such circumstances would have checked the specific test procedure with counsel. And further, a reasonably prudent person would have maintained documentary evidence of this advice for the inevitable day in court. Here the only documentation on testing was the July 15, 1981 letter to Fort Howard which counters any suggestion that "some but not all" of the pins, pads and knives be used:

"The winder will be tested without the allegedly infringing parts, which are the pins, transfer pads and knives ... Therefore, the tests at MGC will only involve the functions of the electrical and mechanical portions of the winder without using the pins, transfer pads and knives." (Tr. 126).

26. There were no other documents relating to the testing of the Fort Howard machine. Even Mr. Custin's diary entries terminated two months earlier—May 19, 1981—dealing with his letter to attorney Fallon on the proposed vacuum modification. The remaining documentation all related to shipment.

## CONCLUSIONS OF LAW

27. In considering the "totality of circumstances" bearing on infringement to determine whether it was willful, the Court places great significance on the fact that Magna-Graphics was operating under an injunction. In such a situation, the general rule is to "keep a safe distance away from the margin line." In the ordinary contempt situation, the Court looks to the devices themselves—that which was enjoined and that which is accused—to see if they are equivalents. In the instant case, there is no such mechanical approach. What the Court has to look to is whether what Mag-

na-Graphics did was justified by the existing law. So the comparison must be with the advice that was given. So, consistent with giving the prohibited activity a wide berth, it is the responsibility of the alleged contemnor to insure that the Court can make the requisite comparison—the accused ctivity with the alleged justification. There is no clear justification here because there is no clear evidence of just what advice was given to Magna-Graphics. Further, the seriousness of the Magna-Graphics' activity is deepened because the protection against contempt which Magna-Graphics sought in the supersedeas bond was refused just prior to the same time the testing occurred. This would cause the reasonably prudent person to be even more careful.

28. Therefore, the Court finds that Paper Converting is entitled to treble damages on the Fort Howard machine and the original judgment order is hereby reinstated.

IT IS SO ORDERED.