**NORTHGATE TECHNOLOGIES, INC., Plaintiff,**

v.

**STRYKER CORPORATION d/b/a Stryker Endoscopy and W.O.M. World of Medicine AG, Defendants.**

**No. 12 C 7032.**

United States District Court, N.D. Illinois, Eastern Division.

Signed March 24, 2014.

science.

William H. Frankel, James Matthew Oehler, Laura A. Lydigsen, Manish K. Mehta, Robert Steven Mallin, David P. Lindner, Brinks, Gilson & Lione, Chicago, IL, for Plaintiff.

Gregory Joseph Vogler, Merle Sylvester Elliott, Robert Anthony Surrette, McAndrews, Held & Malloy, P.C., Edward Timothy Walker, Gregory Michael Smith, Michael R. Dockterman, Edwards Wildman Palmer LLP, Chicago, IL, David J. Silvia, Scott D. Wofsy, Edwards Wildman Palmer LLP, Stamford, CT, for Defendants.

CLAIM CONSTRUCTION AND NORTHGATE'S
MOTION FOR RECONSIDERATION

RICHARD A. POSNER, Circuit Judge.

*Claim Construction*

This is a suit for patent infringement, filed in the Northern District of Illinois on September 4, 2012, by Northgate Technologies, the owner of patent 6,299,592, issued on October 9, 2001. The defendants are Stryker Corporation (doing business as Stryker Endoscopy) and W.O.M. World of Medicine AG; I'll refer to them jointly as "Stryker." Judge Kendall, to whom the suit was originally assigned, held a claim construction hearing on January 8 but the case was transferred to me before she rendered her constructions. I have read the parties' claim construction briefs and the transcript of the hearing before Judge Kendall. I held a supplemental hearing on March 11, and am now ready to rule on the terms in dispute.

I need to explain Northgate's invention briefly. The invention—an "insufflator"—is for use in laparoscopic surgery, which is abdominal surgery performed through small incisions. To create viewing and working space beneath the wall of the abdomen that will enable the surgeon to see what he's doing, the abdominal wall must be elevated ("insufflated" in medical jargon) above the internal organs. This is done by injecting an inert gas (typically, carbon dioxide) through a tube connected to a device called a "trocar" that is inserted into the patient's abdomen through a small incision. (The trocar is a portal through which instruments for performing the surgery are inserted.) The other end of the tube is plugged into the insufflator, which receives the gas and regulates its flow into the patient's abdomen.

The pressure exerted on the abdominal wall by the gas must be monitored to make sure the abdominal wall is elevated to the desired height (called "pneumoperitoneum") but no higher. One way to do this—what the parties call the "conventional" method—is for the insufflator to cause the flow of gas through the tube to be interrupted at short intervals. During the interruptions the insufflator gauges the pressure that the gas is exerting on the abdominal wall. In such "conventional" insufflators, the pressure can't be measured accurately when the gas is flowing. (The reason is that when the volume of gas flowing in the tube is very high, which it has to be to replace gas that leaks out of the abdomen as surgical instruments are inserted and removed during the operation, the gas-pressure sensor tends to measure the gas pressure in the tube rather than the average pressure in the abdomen.) But when the flow of gas is interrupted to enable an accurate measurement of the pressure in the abdomen, the abdominal wall drops slightly, rising again when the flow resumes. The drop and rise create what Northgate calls a "breathing effect," which complicates the surgery.

Northgate's patented insufflator uses a different method of gauging pressure—a method designed to eliminate the breathing effect. Rather than a single tube that requires interruption of the gas flow in order to allow the pressure to be measured, Northgate's invention specifies the insertion of a second tube, of much smaller diameter than the primary tube, into the patient's abdomen through a second incision; and it is that tube rather than the primary tube that is used (subject to a qualification noted below) in measuring the pressure of the gas in the abdomen. A tiny amount of gas is pumped through the second tube—far smaller than the amount of gas pumped into the abdomen by the primary tube and therefore too small to affect the gas pressure in the abdomen or to distort the measurement of that pressure (unlike the distortion that would be

created if the pressure were measured while gas was flowing in the primary tube). The only reason for sending any gas through the small tube is to make sure that the tube is not either blocked or leaking. If it is blocked there will be a sharp increase in pressure, and if it is leaking, a sharp decrease. If the sensor detects such a distortion in gas flow, it instructs the machine to revert to the conventional flow and stop pressure measurement: that is, stopping the flow of gas in the primary tube periodically and, with the flow interrupted, taking a pressure measurement through that tube.

■ Seven claim terms in Northgate's patent are contested, though on analysis they collapse to four. The first (found in claim 1 and several other claims as well, but I won't bother to list the claims in which the claim terms that I'll be discussing are found) is "delivering insufflating gas from a pressurized source of insufflating gas to at least one gas delivery path and a separate sensing line." Northgate interprets "delivering insufflating gas" to mean "delivering gas used with an insufflator," that is, gas used for insufflation. Stryker insists that the term means "delivering gas to the patient's abdominal cavity to achieve insufflation through both" the primary tube and the separate sensing line—in other words, "insufflating gas" can mean only "gas that actually inflates the patient's abdomen," so that if the tiny stream of gas in the separate sensing line has no insufflating effect (that is, does not move the abdominal wall), it is not an insufflating gas.

Northgate is right, Stryker wrong. There is no gas named "insufflating gas." The term just denotes whatever gas (typically, as I said, carbon dioxide) is used to raise (insufflate) the abdominal wall. In Northgate's patented invention, a small amount of this gas is channeled through the separate sensing line—not to insufflate, which is neither its purpose nor (because there is so little of it) its effect, but to make sure that the sensing line is properly sensing the pressure exerted by the gas entering the patient's abdomen through the primary tube—and not being fooled by either a leak or a blockage. Stryker thus is wrong to interpret the claim term to mean that the gas passing through the separate sensing line is intended "to achieve insufflation." The claim makes clear that only the primary tube delivers gas to the abdomen for the purpose of insufflation, because it states that the "insufflating gas" is sent to "at least one gas delivery path and a separate sensing line." The purpose of the primary tube is to deliver the gas that does the insufflating; the purpose of the sensing line is to gauge the pressure exerted by the gas pumped through the primary tube on the abdominal wall.

■ The next contested claim term is "separate sensing assembly." (The parties agree that this term is synonymous with another claim term, "internal sensing assembly," which therefore I need not discuss.) Northgate says this term means "a sensor that measures pressure in the separate sensing line," Stryker that it means "a pressure sensing system that includes a sensor which measures pressure in the separate sensing line while gas flows in the separate sensing line." There isn't much difference between these interpretations, except that Stryker's might be thought to mean that when the sensing assembly isn't being used, but is just sitting on the shelf between surgeries, it isn't a sensing assembly, because no gas is flowing in the separate sensing line. That would make no sense. Northgate's interpretation is not quite right either, but easily corrigible. The sensing *assembly* is not just the sensor; it's the sensor plus the source of the

gas flow in the separate sensing line, since the presence of gas in that line is essential to the practice of the patented invention.

■ The third contested claim term is "continuous delivery of insufflating gas." (Again the parties agree that there is a synonymous term—"insufflating gas is delivered ... at a continuous rate"—that therefore I needn't discuss separately.) Northgate says that "continuous delivery of insufflating gas" means "uninterrupted flow of insufflating gas for a period of time that is longer than the flow of insufflating gas used in conventional flow and stop insufflators." Stryker says it means "uninterrupted flow of insufflating gas, i.e., flow 100 percent of the time."

Neither interpretation is precise. The flow of gas in Northgate's insufflator is continuous only until there is a mishap—a blockage or leakage of the sensing line—although in normal operation it is continuous, unlike a flow and stop insufflator, which interrupts the gas flowing through the delivery tube every few seconds to enable a measurement of the gas pressure in the abdomen. But Stryker's proposed definition is also wrong because, as is plain from a reading of the patent, Northgate never claims that the flow of gas in either tube can't be interrupted by a mishap of some sort.

■ Attention to the purpose of claim construction will help resolve the interpretive issue. The purpose is to determine whether the patentee is claiming something that isn't actually within the patent's scope. No one reading Northgate's patent could suppose that Northgate was claiming that the flow of gas in either tube can never be interrupted. On the contrary, interruption is a key element of the invention. The flow of gas in the sensing line is intended to be disrupted whenever there is blockage or leakage of that line, and the disruption in turn triggers a stop (inter-ruption) in the flow of gas in the primary tube to enable a pressure measurement in that tube. I therefore interpret the claim term to mean continuous except for occasional, unplanned interruptions attributable to mishap. The conventional flow and stop insufflator, in contrast, is deliberately discontinuous.

The next term that I need to construe is "non-continuous delivery of insufflating gas," but that is just the obverse of the preceding term, and so does not require separate discussion.

■ Another term in the patent, closely related to the terms I've just been discussing, is "continuously monitors pressure." Northgate's interpretation ("uninterrupted monitoring of pressure for a period of time longer than the monitoring time used in conventional flow and stop insufflators") is correct. Even when blockage or leakage in the sensing line causes Northgate's insufflator to stop the flow of gas in the primary tube in order to enable the gas pressure to be measured through that tube, the sensing line is continuing to monitor the pressure through that line, so that if and when the blockage or leakage resolves itself the continuous flow through the primary tube can resume. Stryker's interpretation—"monitors pressure with no interruptions, i.e., 100 percent of the time"—is also correct. As long as the insufflator is switched on, gas pressure will be monitored in the sensing line without interruption even when the separate sensing line is blocked or leaking or the flow of gas in the main delivery line is interrupted. But I don't want to inject possible confusion into the case by adopting two constructions of the same term. Stryker's seems to me clearer as well as more succinct, so I adopt it.

■ The fourth and last claim term at issue is "an internal sensing assembly con-

nected to said separate sensing line through a first control valve," and its partial synonym "first control valve." Northgate argues that the term means "a sensor that is connected to and measures pressure in the separate sensing line and a valve capable of affecting gas flow from the separate sensing line to the sensor." Stryker says it means "the first control valve located between and connected to the internal sensing assembly and the separate sensing line" and (equivalently, it appears) "a valve that controls the infusion rate of insufflating gas."

By "first" control valve the patent means simply the valve that is mentioned first in the patent. Stryker argues that to be a "control" valve the valve must affect the *rate* of gas flow, and thus have more than just an on or off (open or closed) setting. That is incorrect. Remember that the term has reference only to the separate sensing line. The gas in that line

functions only as a monitor of the integrity of the line. Therefore an on-off valve is all that is needed.

As for the term in which "first control valve" is embedded—"an internal sensing assembly connected to said separate sensing line through a first control valve"—Northgate argues that all it requires is that the sensing assembly control the flow of gas to the separate line by means of the first control valve. Stryker argues that the valve must be located between the line and the internal sensing assembly—which it is: as shown in Figure 1, the primary control valve (number 135 in the diagram) is between the sensing assembly (245) and the sensing line (375). But why the precise location of the valve should have any significance, or be thought implied in the word "connected," eludes me. Northgate's construction is the more natural interpretation of the claim language, and I adopt it.

**U.S. Patent 6,299,592, Figure 1**

*Northgate's Motion for Reconsideration:*

■ Northgate's first amended complaint alleged (along with direct infringe-

ment) induced infringement—specifically that Stryker had induced physicians or other medical personnel to infringe Northgate's patent by connecting parts, not themselves patented, to form an infringing device, namely an insufflation device that injects gas into the patient's abdomen through one tube and measures the gas pressure in the abdomen through another. But in its final infringement contentions Northgate dropped the induced-infringement claim. Later still, Northgate asked Judge Kendall for permission to restore the claim. She refused. Northgate asks me to reconsider her denial, but I decline to do so because Northgate has failed to advance a plausible reason for resurrecting an abandoned ground for relief.

Stryker argues that without a claim for induced infringement Northgate's suit fails because induced infringement is all that Northgate is claiming. (Northgate of course disagrees that that's all it's claiming; if it agreed, it would not have dropped its claim for induced infringement.) Northgate sells the two tubes in separate packages. Hospital staff remove the tubes from their packages and plug them into the insufflator itself—the box (shown below) that contains the pressure gauges and the link to the gas supply and the other components of the overall product except the two tubes.

**The Northgate Insufflator**

Northgate does not claim patent protection for either tube standing alone, but rather for the entire sensing assembly, which includes the pressure-sensing assembly inside the insufflator, to which the little tube is connected. Stryker argues that the smaller tube alone is the "separate sensing line" discussed in the patent. That is implausible. The *tube* doesn't sense anything; the sensor is a pressure gauge inside the apparatus to which the tube is attached.

The fact that a product is delivered in multiple packages rather than a single package and assembled by the customer is irrelevant to whether it is a single patented product. Virtually every patented product is actually an assembly of parts, some or many of which are not patented. What difference could it make to patent law whether Northgate sells its product with the tubes dangling from the apparatus, like a two-legged octopus, or with the tubes in their own packages, ready for a nurse to plug into the apparatus? None. See *Fantasy Sports Properties, Inc. v.*

*Sportsline.com, Inc.,* 287 F.3d 1108, 1118–19 (Fed.Cir.2002); *High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.,* 49 F.3d 1551, 1555–56 (Fed.Cir. 1995); cf. *Paper Converting Machine Co. v. Magna–Graphics Corp.,* 745 F.2d 11, 19–20 (Fed.Cir.1984). This is not a case like *Golden Blount, Inc. v. Robert H. Peterson Co.,* 438 F.3d 1354, 1359–64 (Fed. Cir.2006), in which the patent is for a complicated assemblage of parts and the (indirect) infringer instructs customers on how to assemble them—how to create the patented invention. It is an irrelevant detail in this case that Northgate sells tubes, rather than telling the purchasers of the sensing assembly what kind of tubes they should buy.

Suppose Stryker sold lamps alleged to infringe a Northgate lamp patent. The lamps wouldn't work without bulbs. Would it follow that if Stryker sold lamps that infringed the patent it would be only an indirect infringer because the infringement isn't complete until the purchaser of the lamp inserts a bulb? No, because the bulb is not part of the invention, any more than the supply of electricity required to activate the bulb. Similarly, the little sensing tube is not part of the invention. The invention is an apparatus for sending gas through two tubes of different size for different purposes in the surgery; the tubes correspond to light bulbs in my example.